**Janelle M. VIGARS, Plaintiff,**

v.

**VALLEY CHRISTIAN CENTER OF DUBLIN, CALIFORNIA, Valley Christian Schools, et al., Defendants.**

**No. C91–2185 TEH.**

United States District Court,
N.D. California.

May 20, 1992.

Frank D. Presto, III, Pleasanton, Cal., for plaintiff.

Seven H. Lave, Fremont, Cal., William C. McKinley, Gary L. Hall, McKinley Gay & Keitges, Sacramento, Cal., for defendants.

## ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on defendants' Motion for Summary Judgment, which came on for hearing on Monday, May 18, 1992 at 10:00 a.m. After considering the parties' written and oral arguments, and for the reasons set forth below, it appears to the satisfaction of the Court therefrom that defendants' motion for summary judgment should be DENIED.

### FACTUAL BACKGROUND:

There is no substantial dispute about most of the underlying facts in this case. Defendants are a church, a parochial school run by the church, and several church and school administrators. Plaintiff was employed by the school as a librarian.

All employees of the school and church are required to be "born-again believers living a consistent and practical Christian life." They are required to sign a statement of faith, to commit themselves to the mission of the church (to instill fundamentalist christian values) and to commit themselves to a fundamentalist christian lifestyle that emulates the life of Christ.

Although plaintiff was primarily employed as a librarian, throughout her employment she fulfilled various other roles as well. She had daily contact with students in her role as librarian, and although she was never a "teacher" in that she did not teach either religion or secular courses, she did work as a physical education teacher, a teacher's aid, and a child care worker at times in addition to her work as librari-

an. She had ultimate responsibility for managing the library and censoring the books brought into the school.

Plaintiff sent her children to the school. Each year, when she re-enrolled them, she signed an affirmation agreement in which she agreed that she and her children would be bound by the moral values, codes, doctrines and beliefs of the church. When she became a school employee, she received a "handbook" and "manual" which detailed the school's and church's mission, her role in that mission as mentor and roll model, and repeatedly stressed that employees of the school were required to live a life in conformity with the fundamentalist beliefs of the church.

It is undisputed that plaintiff was fired from her job as school librarian after she informed the administration that she was pregnant. Apparently, plaintiff was in the process of having one marriage annulled and was planning to marry her current husband at the time she became pregnant. She subsequently gave birth to a son, who is the child of her present husband, not the man she was married to at the time her son was conceived.

There is substantial disagreement, however, as to one material fact in this case. Defendants originally asserted (in their motion to dismiss) that plaintiff was fired for the sin of being pregnant out of wedlock. They included a copy of her termination letter to prove that point. It states without equivocation that the reason for her termination was the fact that she was "pregnant without benefit of marriage", which condition was inconsistent with the religious values of the church and school. However, in their summary judgment motion, defendants—for the first time—assert that plaintiff's termination had nothing to do with her pregnancy. On the contrary, she was fired, they now allege, because the school learned that she was involved in an adulterous relationship (i.e., sexual relations with her "new" husband before she was divorced from her "old" husband). Her pregnancy was *evidence* of that adulterous relationship, they now allege, but had noth-

ing to do with the *religious* reason for her termination.

## DISCUSSION

 Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985); Fed.R.Civ.P. 56. Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence, and is required to view the evidence in the light most favorable to the nonmoving party. *Id.*

 A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, she must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. However, on an issue for which her opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the District Court ... that there is an absence of evidence to support the nonmoving party's case." *Id.*

 If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is some genuine issue for trial" in order to defeat the motion. *Anderson, supra*, 477 U.S. at 250, 106 S.Ct. at 2511; Fed.R.Civ.P. 56(e). A grant of summary judgment is reviewed *de novo* by the appellate court; a denial of summary judgment is reviewed for an abuse of discretion. *United States v. 5,644,540 in U.S. Currency*, 799 F.2d 1357, 1361 (9th Cir.1986).

 As noted above, there is a dispute in the record as to the exact reason for plaintiff's termination. Therefore, the primary question before this Court is whether defendants' change in position raises material questions of fact which require resolution by a jury. Plaintiff apparently does not see a material difference between defendants' differing positions. However, it is apparent to this Court that defendants' "new" position—that plaintiff was fired for adultery, and not on account of her pregnancy—would not give rise to a Title VII claim. Congress has specifically exempted religious organizations from Title VII liability on the basis of religious discrimination. *E.E.O.C. v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1276 (9th Cir.1982); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints, et. al. v. Amos*, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987); *see* discussion *infra* at 806–08.

However, defendants' "old" position—that plaintiff was fired because she was pregnant and not married—raises the possibility of sex discrimination. If Title VII does not apply to that decision, there would obviously be no *material* fact in dispute because plaintiff would not be entitled to relief under Title VII in either event. If Title VII does apply, however, the dispute as to the true basis for plaintiff's termination becomes material. Therefore, it is necessary to determine whether Title VII applies to a decision to fire plaintiff based on her pregnancy and whether that application overcomes First Amendment scrutiny.

## I. TITLE VII CLAIM

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on sex. 42 U.S.C. §§ 2000e et. seq. Section 2000e–2(a) states that:

[i]t shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or *to discharge* any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

cause of such individual's race, color, religion, sex, or national origin....

In response to several restrictive Supreme Court decisions, Congress amended Title VII to state that "the terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy...." · 42 U.S.C. § 2000e(k). This amendment, the Pregnancy Discrimination Act, expressly prohibits employers from discriminating against women on the basis of pregnancy.[1]

Defendants argue that whether or not plaintiff's pregnancy was the precipitating event which led to her termination, the underlying decision to fire plaintiff was a *religious* one, based upon a widely recognized and sincerely held belief that extramarital sex is a sin. Firing her, therefore, does not implicate Title VII, or at the very least falls within the exception to Title VII for religious organizations.

■ However, it is clear that Title VII *generally* applies when a women has been terminated for pregnancy, regardless of the *reason* put forth by the employer as to why that pregnancy justifies termination. Therefore, unless Title VII does not apply to this particular employment decision because of statutory or constitutional grounds, defendants are in violation of the PDA if they fired her because of her pregnancy.

## A. *Religious Entities Exceptions*

Defendants argue that the Title VII "religious entities" exemptions prohibit application of Title VII to this claim. Before reaching the merits of that argument, however, I must first determine whether the proposed application of Title VII "would give rise to serious constitutional questions." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979). If so, I cannot find the statute applicable unless there is an "affirmative intention of Congress clearly expressed" to apply it. *Id.*

Application of the statute would clearly raise serious constitutional questions. It would impact the very ability of a church to exercise a fundamental tenant of its faith. We need not look long into this issue—the case law in this circuit is clear that application of Title VII to claims of sex discrimination based upon a religious belief raises serious constitutional questions, and the parties concede this· point. *See Pacific Press,* 676 F.2d at 1276 (application of Title VII to religious publisher's decisions, based on sincerely held religious beliefs, to pay men more than women and to fire plaintiff for filing suit against the church, raised serious constitutional questions.)

With regard to the second issue, the legislative history of Title VII has been exhaustively analyzed in this Circuit, and the Circuit has consistently concluded that Title VII was intended to apply broadly, and that the religious entities exception was intended to provide only a limited exception. *Id.; see also E.E.O.C. v. Fremont Christian School,* 781 F.2d 1362 (9th Cir. 1986).

Title VII provides exemptions for religious schools in certain narrowly-defined aspects of their functions as religious entities. 42 U.S.C. § 2000e–2(e)(2) states that

(e) Notwithstanding any other provision of this subchapter, ·... (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, ... is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation association, or society, or if the curriculum of such school, ... is

---

1. The PDA reads in pertinent part as follows: The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise.

directed toward the propagation of a particular religion.

42 U.S.C. 2000e–1 provides a similar exemption for "religious entitles."[2]

 The legislative history of these statutory exemptions indicates that Congress intended Title VII to apply to sex-based employment decisions by religious entities. The exemptions do not simply exempt religious organizations from Title VII. On the contrary, they "show[ ] that although Congress permitted religious organizations to discriminate in favor of members of their faith, religious employers are not immune from liability for discrimination based on race, sex, national origin, or for retaliatory actions against employees who exercise their rights under the statute." *Pacific Press*, 676 F.2d at 1276. Thus, church organizations have been held liable under Title VII for benefit and employment decisions which they contended were based upon religious grounds but which also discriminated against women based upon sex. *See Pacific Press, supra* (religious publishing company which paid men more than similarly situated women based upon sincerely held religious beliefs violated Title VII); *and Fremont Christian School, supra* (religious school which paid men health benefits but denied such benefits to similarly situated women because of sincerely held belief that men are the "heads of the household" violated Title VII).[3]

Defendants argue that *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints, et. al. v. Amos*, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), essentially overruled *Pacific Press* and *Fremont Christian School*, and dictates that courts broadly construe the religious entities exception. In that case, an engineer was fired from his job at a church-owned gym because he had failed to meet the requirements of membership in the church. He argued that he had a "non-religious" job, and therefore that Title VII prohibited religious discrimination in his case. The Court disagreed, and stated that it would not differentiate between *types* of employees. Rather, the exception covered "all activities of a religious employer," including the "non-religious" functions.

*Amos* in no way overrules *Pacific Press* or *Fremont Christian School*, and in no way expands the religious entities exemptions. On the contrary, it further defines them. The Supreme Court's decision comports with the 9th Circuit's reading of the religious entities exemption—i.e., that religious employers can discriminate on the basis of *religion* under these exceptions. It simply does not state that *all* employment decisions of a religious entity are off limits from Title VII, so that churches are free to discriminate on the basis of sex or race while other non-religious employers are not. The legislative history is clear on that point, and the case law in other circuits concurs. *See Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164 (4th Cir.1985) (Title VII applicable to defendant's rejection of plaintiff for pastoral position based on sex, as Title VII exemptions do not give religious organizations license to make discriminatory decisions on the basis of race, sex or national origin); *and E.E.O.C. v. Mississippi Col-*

---

**2.** It states:
 This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its activities.

**3.** Defendants rely, almost exclusively, on a recent 3rd Circuit decision, *Little v. Wuerl*, 929 F.2d 944 (1991), in which the court came to exactly the opposite decision. Contrary to the 9th Circuit, the 3rd Circuit argued that the legislative history of the religious entities exemp-

tions indicated that Congress intended them to apply *broadly*, to cover almost any employment decision by a religious entity. Interestingly, the court found compelling the exact legislative history that the 9th Circuit found unimpressive, and seems to have relied upon statements made before Congress that were ultimately *rejected* by the majority. This case signals a developing split in the circuits which the Supreme Court will have to address. However, because this Court finds the 9th Circuit's reasoning far more persuasive, and because the law in this Circuit is settled on this issue, *Little* holds little significance for our inquiry.

**808**

*lege,* 626 F.2d 477 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (employment relationship between college and its faculty not exempt from Title VII scrutiny).

▪ In the present case, plaintiff may have been fired because of her pregnant condition. The PDA makes it clear that that is per se sex discrimination. In enacting the PDA, Congress expressed its intention to apply Title VII to just such a case as this. *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 683, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89 (1983). That this case could involve sex discrimination is made even more clear when one remembers that *only* women can *ever* be fired for being pregnant without benefit of marriage. Thus, women would be subject to termination for something that men would not be, and that is sex discrimination, regardless of the justification put forth for the disparity. The fact that defendants' dislike of pregnancy outside of marriage stems from a religious belief may be relevant to the Court's *First Amendment* analysis, but it does not automatically exempt the termination decision from Title VII scrutiny. Defendants' motion for summary judgment on this issue is DENIED.

## B. *BFOQ and Business Necessity Defenses*

Defendants argue that plaintiff served as a role model for the students at the school, and thus that her moral character and "non-pregnant out of wedlock" status was a BFOQ.

▪ An employer may justify discrimination otherwise prohibited by Title VII by showing either a business necessity or a bona fide occupational qualification (BFOQ). *Carney v. Martin Luther Home, Inc.,* 824 F.2d 643, 648 (8th Cir.1987).

However, an employer seeking to establish either of these defenses bears a heavy burden. *Dothard v. Rawlinson,* 433 U.S. 321, 333, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). The Supreme Court and the lower federal courts are all in agreement that these defenses provide "only the narrowest of exceptions to the general rule requiring equality of employment opportunities." *Id.* The employer must demonstrate a "manifest relationship to the employment in question", or a "compelling need" to maintain the discriminatory practice. *Id.*

▪ In the present case, defendants' "role model" argument has support.[4] In *Chambers v. Omaha Girls Club, Inc.,* 834 F.2d 697 (8th Cir.1987), the 8th Circuit upheld a private, nonprofit girls club's personnel "role model rule" which banned single parent pregnancies among its staff members. The club was founded to "assist young girls between the ages of eight and eighteen to maximize their life opportunities." *Id.* at 698. The club counselors were to develop close contacts and strong relationships with the member girls and they were trained and expected to act as role models in the hope and expectation that the girls would emulate the counselors' behavior. In essence, their *function* was to act as role models for young girls.

▪ Although the analogy here is tempting, it is ultimately not persuasive because it loses sight of the very narrow focus of the BFOQ and business necessity defenses. In order to assert the defenses, the person's job must depend upon the discriminatory characteristic. In the present case, plaintiff acknowledges that she was required to work closely with the students and to practice a lifestyle which modeled the mission of the church to the students, and that she understood that the school stressed the importance of modeling moral values and religious doctrine to the

**4.** Defendants put forth another argument which deserves only cursory attention. They argue that the parents who send their students to the school expect a certain moral character from the teachers, and that both those parents and other employees could be "upset" were they to discover that the church had "refused to stand up for its religious doctrine after that doctrine was challenged by" plaintiff. However, it is clear that fellow employees' and customers' "preferences" do not constitute BFOQ's for sex discrimination any more than they constitute BFOQ's for race discrimination. For example, sex is not a BFOQ for airline stewards simply because many male passengers prefer to be waited upon by women.

students. However, there is serious disagreement about how central her moral life was to her job as librarian, whether or not she was truly expected to act as a role model in the *Chambers* sense, and what impact her pregnancy truly had on her ability to perform either of those functions. Therefore we cannot say as a matter of law that the BFOQ and business necessity defenses would or would not justify defendants' pregnancy discrimination, and defendants' motions for summary judgment on this issue must be DENIED.

### C. *First Amendment*

Defendants argue that "the First Amendment protects churches' autonomy to make internal religiously-based employment decisions without government interference." Application of Title VII to the instant employment decision, they argue, would violate both the Establishment Clause and the Free Exercise Clause (although they consistently fail to differentiate between the two).

#### 1. Establishment Clause

■ When examining whether legislation violates the Establishment Clause, courts apply a three-step test: (1) the statute must have a secular purpose, (2) the primary effect of the statute must neither advance nor inhibit religion, and (3) the statute must not foster excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

■ As the 9th Circuit has repeatedly determined, Title VII does not violate the Establishment clause. *Pacific Press*, 676 F.2d at 1281–82; *Fremont Christian School*, 781 F.2d at 1367–68. The primary purpose of Title VII is clearly secular. Furthermore, its primary effect is not to either promote or inhibit religion, but instead is to render illegal the vast majority of sex, race, and national origin-based discrimination. Finally, application of Title VII in the present case will not result in excessive government entanglement with religion. As in *Pacific Press*, neither a judgment in this suit nor the enforcement mechanism of Title VII in general results

in any *ongoing* scrutiny of the school's operations. *Id.* at 1281. Defendants' motion for summary judgment on this issue is DENIED.

#### 2. Free Exercise Clause

■ The Free Exercise Clause presents defendants' most compelling argument. Had this case come before me two years ago, I would have had to employ a three-part balancing test that weighed (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state. *Pacific Press*, 676 F.2d at 1279, *citing Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). However, in 1991, the Supreme Court "dramatically altered the manner in which we evaluate free exercise complaints...." *American Friends Service Committee v. Thornburgh*, 951 F.2d 957 (9th Cir.1991). As recognized by the 9th Circuit in *American Friends*, free exercise claims must now fail " 'if prohibiting the exercise of religion ... is not the *object* of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision....' " *Id.*, quoting *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990).

Under this new test, defendants' arguments clearly fail. There is no allegation, nor can there be, that Title VII's prohibitions are directed at religious beliefs or the exercise of religion. *See American Friends*, 951 F.2d at 960. Title VII neither regulates religious beliefs, nor burdens religious acts, *because* of their religious motivation. On the contrary, it is clear that Title VII is a secular, neutral statute which, in this case, incidentally has a profound impact on defendants' free exercise of their religion. As in *Smith*, however (where that "incidental impact" was devastating), such incidental impact does not constitute a violation of the Free Exercise

Clause. Defendants' motion for summary judgment on this issue must be DENIED.[5]

It is therefore apparent to this Court that whether defendants terminated plaintiff because she was committing adultery or because she was pregnant without benefit of marriage is determinative of whether Title VII applies to this case. Because the exact reason for her termination is in dispute, there is a material issue in dispute and summary judgment is DENIED.

## II. STATE LAW CLAIMS

### A. *Invasion of Privacy*

Plaintiff claims an invasion of her right to privacy. However, that is all she says. She has not defined this legal claim, nor has she responded to the defendants' argument that the question of whether an individual's right to privacy has been infringed depends upon whether they had a "reasonable" expectation of privacy and whether there has been unreasonable *government* intrusion. *See People By and Through Franchise Tax Board v. Superior Court,* 164 Cal.App.3d 526, 540–41, 210 Cal.Rptr. 695 (1985). This claim is fatally vague and incomprehensible, and should be dismissed. Defendants' motion on this claim is GRANTED.

### B. *Breach of Contract/Covenant of Good Faith and Fair Dealing*

Defendants initially concede that plaintiff had a year to year employment contract with the school. The parties admit that there was written no employment contract. Then, however, defendants argue that plaintiff's contract was not for a specified time, but was unspecified and therefore terminable at will under California Labor Code § 2922. Therefore, they argue, they were free to fire plaintiff whenever they wanted.

This argument is contradictory and makes no sense. By their own admission, plaintiff had a contract for the "school year." At the end of that year, she would notify the school of her desire to remain, and it would decide whether to rehire her. Therefore, her employment *was* for a term—the school year. At the very least, more evidence is required to resolve this issue. Summary judgment is DENIED.

### C. *Remaining Claims*

Plaintiff also brings claims for state-law based sex discrimination and wrongful discharge. However, both of these claims are dependent upon the federal claims. Because the "illegality" of the initial decision has not been determined, summary judgment is DENIED.

Therefore, and good cause appearing, IT IS HEREBY ORDERED that defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

---

**5.** I would note, however, that although it would indeed be a *close* call under traditional Free Exercise analysis, the state's compelling interest in enforcing Title VII and eradicating sex discrimination would likely have outweighed the substantial burden that application of Title VII to this case will place on defendants' free exercise rights.