NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4713-18T3

VICTORIA CRISITELLO,

     Plaintiff-Appellant,

v.

ST. THERESA SCHOOL,

     Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

November 19, 2020

APPELLATE DIVISION

Submitted September 14, 2020 – Decided November 19, 2020

Before Judges Rothstadt, Mayer, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-3642-14.

Castronovo & McKinney, LLC, attorneys for appellant (Thomas A. McKinney, of counsel and on the briefs; Megan Frese Porio and Edward W. Schroll, on the briefs).

Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC, attorneys for respondent (Christopher H. Westrick, of counsel and on the briefs; Kenneth D. McPherson, on the briefs).

    The opinion of the court was delivered by

ROTHSTADT, J.A.D.

In this action brought under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, we are asked to determine whether a parochial school's knowledge of the pregnancy of an unmarried lay teacher, who started as a teacher's aide for toddlers, later taught art, and had no responsibility for religious instruction, can serve as the nondiscriminatory basis for the teacher's termination for violating the school's morals code, where the school never made any effort to determine whether any of its other employees have violated the school's prohibition against "immoral conduct" that is allegedly incorporated into each employees' terms of employment. We now hold that knowledge or mere observation of an employee's pregnancy alone is not a permissible basis to detect violations of the school's policy and terminate an employee.

I.

Plaintiff Victoria Crisitello brings this matter before us a second time to review an order granting summary judgment to defendant St. Theresa's R.C. Church, the owner and operator of St. Theresa School, dismissing plaintiff's complaint for damages arising from her allegedly unlawful termination as a lay teacher at defendant's school based solely upon defendant learning that plaintiff was pregnant while unmarried. In an earlier unpublished opinion, we determined that the First Amendment to the United States Constitution did not

2                                                        A-4713-18T3

bar plaintiff's action, and that plaintiff established a prima facie claim of discrimination under the first step in the McDonnell Douglas analysis.[1] We reversed the award of summary judgment and remanded to allow for discovery as to "the issue of defendant's treatment of all 'similarly situated' employees who defendant knew were in violation of its ethics code," which had been denied by the trial court. Crisitello v. St. Theresa Sch., No. A-1294-16 (App. Div. July 24, 2018) (Crisitello I) (slip op. at 27). We did so because "[a]bsent evidence that men are treated the same way as women who are terminated for engaging in premarital sex, a religious institution violates [the] LAD" if the institution terminates a woman for engaging in premarital sex based solely on knowledge of her pregnancy. Id. at 22. Considering "women can become pregnant [and] men cannot," that termination "punishes only women for [premarital] sexual relations because those relations are revealed through pregnancy." Ibid. (first alteration in original) (quoting Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 667 (6th Cir. 1999)).[2]

---

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[2] In LAD cases, we "frequently look to federal precedent governing Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e to § 2000e-17 ('Title VII'), as 'a key source of interpretive authority,'" unless "that law sharply diverges from prior authority construing the LAD [or does not] further[] the objectives

A-4713-18T3

After our remand and the parties having engaged in the required discovery, defendant again filed for summary judgment, which the trial court[3] granted on May 23, 2019. On appeal from that order, plaintiff argues that the trial court improperly granted summary judgment as defendant had no specific policy explaining that an employee could be terminated for premarital sex and her termination was solely due to defendant's knowledge of her pregnancy.

We reverse because on summary judgment it was undisputed that defendant took no actions to detect whether any of its employees violated Catholic tenets or breached defendant's employee handbook. Instead, the evidence established that defendant relied only upon knowledge of its female employees' pregnancy and marital status as a basis to enforce its code of ethics and handbook requirements—neither of which expressly addressed premarital sex as a prohibited conduct, but of which the former prohibited engaging in "immoral conduct" that could cause "scandal."

---

of the LAD [or] comport[] with our prior holdings." Aguas v. State, 220 N.J. 494, 510 n.4 (2015) (citations omitted).

[3] A different judge decided the motion since the judge who considered the prior motion had retired.

For our purposes here, we need not recite at length the undisputed facts as stated in our earlier opinion. See id. at 3-12. We only summarize the portion of that recitation that is pertinent to the present review.

As we previously explained, it was undisputed that defendant required all of its "lay faithful" teachers, "whether employed in areas of ministry or other kinds of services," to abide by a code of conduct that was not "contrary to the discipline and teachings of the Catholic Church[,] and/or which may result in scandal . . . or harm to the ministry of the Catholic Church." Additionally, defendant's handbook contained numerous provisions aligning with the Church's tenets, including a section labeled "Christian Witness" which required teachers to practice a "value-centered approach to living and learning in their private and professional lives." The handbook also provided that each staff member "integrate culture, faith, and life through the teachings of all subject areas in the light of the Gospel so that the children can become 'good Christians and honest citizens.'"

However, it was also undisputed that

> [n]one of the policies or provisions of the handbook expressly identified premarital sex as a prohibited conduct. According to the school's principal, Sister Theresa Lee, there was no specific statement in any document that "would inform someone that if they became pregnant while being unmarried that they

5

would be violating [any] policy." There was also no statement in the documents that a violation of any provision would result in immediate termination from employment.[4]

[Id. at 4-5.]

---

[4] In a note to our earlier opinion, we explained the following:

The only specifically identified prohibited behavior was contained in the Church's code of ethics, which included a chapter entitled "Prevention of Immoral Conduct: Guidelines for Ethical Behavior." Under that chapter, in a section entitled "Standards for the Archdiocese as to Prevention of Immoral Conduct," specific prohibited conduct was defined as:

    a. Immoral conduct.
    b. Procurement or participation in the procurement of abortion, or committing homicide or euthanasia.
    c. Possession or distribution of pornographic material.
    d. Adultery, flagrant promiscuity or illicit co-habitation.
    e. Abuse of alcohol, drugs, or gambling.
    f. Theft, fraud, or any other form of misappropriation or misuse of Church funds or property.
    g. Sexual exploitation or abuse.
    h. Physical assault and fighting.
    i. Conduct which is illegal under the laws of our country, state or local government.

    [Id. at 4 n.1.]

A-4713-18T3

Plaintiff, who held a bachelor's degree in art education, was hired by defendant in September 2011, as a teacher's aide "in the toddler room." Two years later, plaintiff also began teaching art for students in kindergarten to eighth grade. Plaintiff never taught courses about religion nor did she act as a minister or any other member of the clergy.

When defendant hired plaintiff, she received a copy of defendant's Policies of Professional and Ministerial Conduct (Policies) and Code of Ethics as well as the handbook. Moreover, she was aware of the Church's prohibition against premarital sex.

In 2014, while having a conversation about defendant wanting plaintiff to assume additional responsibilities, plaintiff advised the school's principal, Sister Theresa Lee, that she was pregnant and that if she were to perform additional work, she would like to be paid more. In response, Lee advised that there would be no pay increase.

A few weeks later, Lee, on her own, decided to fire plaintiff for engaging in premarital sex. However, before doing so, defendant hired a replacement who was a married woman with children. When defendant finally fired plaintiff, it told her she was being terminated because she was pregnant and unmarried. It was undisputed that plaintiff's termination related only to that fact as compared

A-4713-18T3

to her job performance. It was also undisputed that defendant never made any "inquiry of any employee as to whether they were pregnant, unmarried, engaged in premarital sex, divorced, or otherwise violated any of the Church's doctrines." Id. at 7.

In reversing the earlier summary judgment order, we considered plaintiff's claim under the LAD. Id. at 17. We acknowledged defendant's right to terminate a teacher whose employment was conditioned upon adherence to its "religious principles," id. at 12-13, and we explained in detail why plaintiff's claim was not barred by the First Amendment to the United States Constitution, id. at 13–16, or by N.J.S.A. 10:15-12(a) which permits a "religious association" to "follow[] the tenets of its religion in establishing and utilizing criteria for employment of an employee." Id. at 16-18.

We also determined that plaintiff established "a prima facie claim," id. at 23, as she was part of a protected class "through her marital status and pregnancy," qualified for her position, terminated for her marital status and pregnancy, and replaced by a similarly situated individual, which gave rise to an inference of unlawful discrimination. Id. at 23-26.

We also explained the relevance of evidence of disparate treatment to plaintiff's claim. Specifically, "how male or not pregnant female teachers at

defendant's school who <u>engaged in premarital sex were detected</u> or treated by defendant." <u>Id.</u> at 22, 27 (emphasis added). We noted that knowledge or mere observation of an employee's pregnancy alone was not a permissible basis to detect violations of the school's policy and terminate an employee. <u>Id.</u> at 22.

The only issue left to determine was "whether defendant's asserted reason for firing plaintiff was pretextual," which required a consideration of other employees who were disciplined or terminated for violation of defendant's policies. <u>Id.</u> at 26. Because the trial court barred discovery of such evidence and granted summary judgment based solely on defendant's "policy being violated . . . [and] the obvious inference plaintiff engaged in premarital sex," we reversed the summary judgment and discovery orders so evidence could be presented on how "all 'similarly situated' employees" were treated by defendant for violations of its ethics code. <u>Ibid.</u>

On remand, the trial court entered an order that required defendant to produce "any documents concerning employees 'similarly situated' to [p]laintiff [defined as all non-clergy employees who worked for [d]efendant during [p]laintiff's employment], whom [d]efendant knew were allegedly in violation of its ethics code by virtue of engaging in premarital sex, being divorced, or any other reason . . . ." (second alteration in original). Further, plaintiff was

required to complete depositions of defendant's witnesses with knowledge about other employees who were similarly situated, limiting the questions to alleged violations of defendant's policies.

On November 8, 2018, defense counsel sent a letter to plaintiff's attorney, informing plaintiff that defendant was "not in possession of any documents, nor any information, regarding any employee 'similarly situated' to [p]laintiff . . . who were known to have violated the ethics code . . . ." Later, plaintiff re-deposed Lee.

At her first deposition, Lee confirmed that she was the only representative of defendant to participate in making the decision to fire plaintiff for "having fornication and not being married." Lee also acknowledged that there was no provision in defendant's code of ethics, its policies, or its handbook that expressly subjected a lay teacher to termination for engaging in premarital sex "that would inform someone that if they became pregnant while being unmarried that they would be violating the policy."

At her second deposition, Lee also stated that plaintiff was the only employee she ever disciplined for violating defendant's polices or code of ethics, and to her knowledge no one else besides plaintiff was disciplined for a violation of the code while Lee worked at the school. She explained that there were no

male teachers working for defendant,[5] and there were three other single women who were employed by the school when plaintiff was working there. Lee never questioned those or any other employees about whether they followed Catholic tenets, if the employees were ever married, divorced, had children, who they lived with, if they were dating, and if any of them were ever pregnant out of wedlock. Lee stated that she also did not question anyone about whether they violated the code of ethics.

At the time of plaintiff's pregnancy, another employee was also pregnant. Lee never asked that employee whether she was married but claimed to have known the employee was married. Lee also never inquired into whether any of defendant's married employees had children out of wedlock as it seemed to be "logical" and part of the "natural biological time frame." Lee also never reviewed any documentation relating to employees' emergency contact information or medical insurance.

Besides plaintiff, Lee never "suspect[ed] that any teacher . . . was in violation of the [c]ode of [e]thics," and no one ever raised the issue to her. She

---

[5] Lee testified that she had no knowledge of any male teachers working at defendant's school prior to the one year she had been working there, and when asked about the number of male teachers who worked there after she started, Lee stated she did not recall any male teachers.

had no knowledge of whether any employee ever cheated, lied, or failed to tell the truth, and she never looked into that because she trusted her employees and colleagues. Throughout her time at the school, Lee never "confirm[ed] whether other teachers besides [plaintiff] were following the [c]ode of [e]thics."

On March 15, 2019, defendant filed its motion for summary judgment. With its notice of motion and statement of material facts, defendant included its counsel's certification and prior certifications from Lee and Deacon John J. McKenna that it filed relative to an earlier motion for summary judgment that the trial court had denied.[6] In support of its motion, defendant argued that plaintiff's admitting she received the code of ethics, understood the code, and signed an acknowledgement that she received the school's handbook supported a finding that plaintiff knew she was being terminated for violating Catholic tenets.

In plaintiff's opposition, she stated that her marital status was not publicly known to defendant. In addition to not informing anyone at the school that she was not married, she also had a promise ring that resembled a wedding ring on

---

[6] As we explained in a note to our earlier opinion, McKenna's certification contained information about what he heard as "the Archdiocese's Vice Chancellor and Executive Director of Human Resources" about what allegedly occurred at a different school. We concluded the certification was "unrelated to defendant's actions" in this case. Crisitello I, slip op. at 8 n.2.

her ring finger when she informed Lee she was pregnant. She contended that nowhere in any of defendant's policies did it specifically indicate that premarital sex would lead to termination of her position. Plaintiff further argued that the lack of actions taken by Lee as to other teachers' conduct demonstrated pretext.

Oral argument was held on April 26, 2019, and on May 23, 2019, the trial court granted defendant's motion. In its statement of reasons, the trial court acknowledged that we previously determined that plaintiff demonstrated a prima facie case of discrimination. For that reason, it began its analysis with step two of the McDonnell Douglas analysis and concluded that it was clear that defendant terminated plaintiff for violating both defendant's policy and its code of ethics.

As to the third step, which addressed whether plaintiff established pretext, the court stated that even with discovery now completed, the record was "bare of any evidence that even remotely suggest[ed] that [violation of the policies was] not the real reason for her termination." Specifically, it stated that plaintiff provided no evidence demonstrating that any other individual was not terminated after violating defendant's policies or that defendant's reasoning for termination was false. The trial court noted that the similarly-situated female

employees were not terminated as they all were married at the time of their pregnancies.

In reaching its decision, the trial court relied upon information in McKenna's certification about a male employee from another school to find that defendant's actions were not discriminatory as that employee was terminated for violating Catholic tenets as well. The court found that there were "no facts upon which a jury could find [defendant] discriminated against [p]laintiff based upon her pregnancy or marital status" as she was not terminated for her pregnancy but, instead, "was terminated for violating the tenets of the Catholic Faith." This appeal followed.

## II.

We begin our review by noting that while this appeal was pending, the United States Supreme Court issued its opinion in Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U. S. ___, ___, 140 S. Ct. 2049 (2020), which addressed the "so-called ministerial exception of the First Amendment," that "protect[s] religious institutions from employment discrimination suits." Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 591 U.S. ___, ___, 140 S. Ct. 2367, 2397 n.1 (2020) (Kagan, J. concurring). The plaintiffs in both cases consolidated in Guadalupe were teachers that taught religion, as well as other

secular topics at their respective schools. Guadalupe, 591 U.S. at __, 140 S. Ct. at 2057-59. They were "elementary school teachers responsible for providing instruction in all subjects, including religion, [and] were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith," and "guid[ing] their students, by word and deed, toward the goal of living their lives in accordance with the faith." Id. at __, 140 S. Ct. at 2066. "There [was] abundant record evidence that they both performed vital religious duties." Id. at __, 140 S. Ct. at 2066. The Court determined that the employees fell within the First Amendment's ministerial exception, even though the employees' "titles did not include the term 'minister' . . . [because] their core responsibilities . . . were essentially the same" as ministers. Ibid.

Relative to the case before us, we allowed the parties to submit supplemental briefs addressing the application of the Supreme Court's opinion. After considering their arguments, we hew to our original determination that the First Amendment does not bar plaintiff's action, as neither party contends that plaintiff's core duties as a lay teacher's aide for toddlers or as an art teacher was the same as the Church's ministers and there was no evidence that she performed any religious duties. As the Supreme Court noted, the outcome of the ministerial

15

exceptions depends "at bottom, [on] what an employee['s]" actual role was for the school. Id. at __, 140 S. Ct. at 2064.

To the extent defendant argues that plaintiff's alleged agreement to refrain from "immoral conduct" converted her from a lay teacher to a minister, we find such contention to be without sufficient merit to warrant further discussion in a written opinion, R. 2:11-3(e)(1)(E), because "[t]he mere fact that the 'faculty members are expected to serve as exemplars of practicing Christians does not . . . make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.'" Gallo v. Salesian Soc., Inc., 290 N.J. Super. 616, 632 (App. Div. 1996) (quoting Welter v. Seton Hall Univ., 128 N.J. 279, 298 (1992)).

## III.

We turn our attention to the challenged summary judgment order under appeal. We review a grant of summary judgment using "the same standard that governs the motion judge's" decision. RSI Bank v. Providence Mut. Fire Ins., 234 N.J. 459, 472 (2018). Under that standard, summary judgment will be granted when "'the competent evidential materials submitted by the parties,' [viewed] in the light most favorable to" the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to

summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)); accord R. 4:46-2(c). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande, 230 N.J. at 24 (quoting Bhagat, 217 N.J. at 38). In our review, we owe "no special deference" to the trial court's legal analysis. RSI Bank, 234 N.J. at 472.

We conclude from our de novo review, viewing the facts in a light most favorable to plaintiff, and giving her the benefit of all reasonable inferences, summary judgment was again improperly granted to defendant because a reasonable trier of fact could conclude that her termination violated the LAD.

Plaintiff asserted a claim of pregnancy discrimination in her complaint based on her termination from employment after advising Lee that she was pregnant. It was undisputed that based on that knowledge, Lee fired plaintiff for engaging in premarital sex, which she only was aware of from plaintiff being pregnant while unmarried.

It is beyond cavil that "[t]he LAD . . . prevents an employer from discriminating against an employee based on her pregnancy." Gerety v. Atl.

City Hilton Casino Resort, 184 N.J. 391, 406 (2005) (citing Gilchrist v. Bd. of Educ. of Haddonfield, 155 N.J. Super. 358, 368-69 (App. Div. 1978)). For plaintiff to establish a prima facie claim of unlawful discrimination under the LAD and thus satisfy her burden under the first step of the burden-shifting framework articulated in McDonnell Douglas, which New Jersey has adopted, see Viscik v. Fowler Equip. Co., 173 N.J. 1, 13-14 (2002), she must establish that (1) she is a member of a protected class, (2) she was performing her job at a level that met her employer's legitimate expectations, (3) she was terminated, and (4) the employer sought someone to perform the same work after she was terminated. Gerety, 184 N.J. at 399. In the context of a claim of pregnancy discrimination, a plaintiff's proofs must establish "that 1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision." Cline, 206 F.3d at 658.

Here, as the trial court correctly observed, we found plaintiff established a prima facie claim of discrimination. There was no dispute that as a pregnant woman she was a member of a protected class under the LAD. See N.J.S.A. 10:5-4, -5(ll). Moreover, there was no dispute that defendant did not have any issues about plaintiff's performance or that she was terminated and replaced with

18

someone else to do her job. Plaintiff therefore satisfied the first step under McDonnell Douglas, as generally, "discrimination based on pregnancy is a clear form of discrimination based on sex, [and therefore] religious schools cannot discriminate based on pregnancy." Cline, 206 F.3d at 658.

Turning to the next steps, because plaintiff established discrimination, defendant had to produce a legitimate, non-discriminatory reason for the adverse employment action, after which, in the third step, plaintiff had to prove that the articulated non-discriminatory reason was not the true reason for the adverse employment action, but rather was a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802-04. Throughout the process, "[t]he burden of proof . . . remains with the employee at all times." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596 (1988)). "Courts have recognized that the prima facie case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence." Id. at 448 (citing Cline, 206 F.3d at 661, 663 n.7). "[T]he plaintiff must come forward with evidence of a discriminatory motive of the employer and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." Romano v. Brown &

Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App. Div. 2002) (emphasis added).

Here, assuming the terms of plaintiff's employment included an enforceable agreement she would not engage in premarital sex, defendant satisfied its "burden of production" by "asserting that it [terminated plaintiff's employment] because she violated her clear duties as a teacher by engaging in premarital sex." Cline, 206 F.3d at 666 (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Boyd v. Harding Acad. of Memphis, Inc., 88 F.3d 410, 414 (6th Cir. 1996); Ganzy v. Allen Christian Sch., 995 F. Supp. 340, 359 (E.D.N.Y. 1998)). Having met that burden, we last consider whether plaintiff demonstrated defendant's stated reason for termination was pretextual.[7]

"To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." Zive, 182 N.J. at 449. A plaintiff may: "(i) discredit[] the proffered reasons [of the defendant], either circumstantially or directly, or (ii) adduce[e] evidence, whether circumstantial or direct, that discrimination

---

[7] For purposes of our discussion we accept defendant's premise that because plaintiff was pregnant and unmarried, she engaged in premarital sex. However, due to advances in modern medicine and related technology, we note that the premise is not necessarily true.

was more likely than not a motivating or determinative cause of the adverse employment action." DeWees v. RCN Corp., 380 N.J. Super. 511, 528 (App. Div. 2005) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). The "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Ibid. (alteration in original) (citations omitted).

A plaintiff "must submit evidence that either casts sufficient doubt upon the employer's proffered legitimate reason so that a factfinder could reasonably conclude it was fabricated, or that allows the factfinder to infer that discrimination was more likely than not the motivating or determinative cause of the termination decision." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 173 (App. Div. 2005) (quoting Svarnas v. AT&T Commc'ns, 326 N.J. Super. 59, 82 (App. Div. 1999)).

When premarital sex is used as the reason for termination, "courts have held that an employer enforcing such a policy unevenly . . . by observing or having knowledge of a woman's pregnancy—is evidence of pretext." Redhead v. Conf. of Seventh-Day Adventists, 440 F. Supp. 2d 211, 223 (E.D.N.Y. 2006)

21

(citing Cline, 206 F.3d at 667).  Proving pretext in these cases includes proof that the employer "enforced its premarital sex policy in a discriminatory manner—against only pregnant women, or against only women."  Cline, 206 F.3d at 667.

Defendant cannot enforce its prohibition by only disciplining women whose premarital sexual relations are disclosed through their pregnancy.  "[A] school [cannot] use the mere observation or knowledge of pregnancy as its sole method of detecting violations of its premarital sex policy."  Ibid.  As we noted in our earlier opinion, "[w]omen [cannot] be subject to termination for something that men would not be, [as] that is sex discrimination, regardless of the justification put forth for the disparity."  Crisitello I, slip op. at 22 (alteration in original) (quoting Vigars v. Valley Christian Ctr., 805 F. Supp. 802, 808 (N.D. Cal. 1992) (denying summary judgment in favor of defendant in a pregnancy discrimination case in which the employer relied upon a religious exemption)).

In Redhead, the defendant failed to produce any evidence that any other employees of that school were terminated for engaging in premarital sex.  440 F. Supp. 2d at 223.  While the court there noted that "[k]nowledge of other teachers engaging in extramarital sexual relations, as reported by [the] plaintiff, [could not] be imputed to the defendant," the defendant must still "explain how

22

it has enforced a policy against such behavior, if it exists, to both males and females." Ibid. The court observed the following:

> Thus, while a religious school employer may validly seek to impose moral doctrine upon its teaching staff, punishment singularly directed at the Hester Prynnes, without regard to the Arthur Dimmesdales, is not permissible. See Nathaniel Hawthorne, The Scarlet Letter (1850); see also Ganzy, 995 F. Supp. at 351 (citing The Scarlet Letter and noting that "[p]artly because women become pregnant, directly evidencing their sexual activity, they have been more frequently subject to such condemnation than men").

> [Ibid. (alteration in original) (emphasis added).]

In Cline, after a Catholic school found out the plaintiff was pregnant, it decided not to renew her contract at the end of the school year. 206 F.3d at 656. There too, the school confirmed the plaintiff was fired due to her pregnancy as a signal she engaged in premarital sex and it did not make inquiry into any of its other teachers as to whether they had engaged in premarital sex. Id. at 667. The Sixth Circuit reversed the district court's grant of summary judgment to the school after it determined that the evidence provided by the parties created "an issue of material fact as to whether [the school] enforce[d] its policy solely by observing the pregnancy of" the plaintiff. Ibid. The evidence, which included that the defendant's policy was a blanket policy, the plaintiff was "sufficiently qualified to teach," and the pregnancy alone signaled to defendant that the

23

plaintiff had premarital sex, raised an issue of material fact that resulted in reversal of the district court's decision. Ibid.

We conclude that the evidence developed on summary judgment in this case established that plaintiff satisfied her burden. As in Cline, plaintiff here adduced evidence that no effort was made to determine whether any employees other than a pregnant lay teacher violated any of the proscriptions contained in defendant's code of ethics or its handbook.[8] As the court explained in Cline:

> [Defendant's] official[] acknowledged in [her] depositions that [plaintiff's] pregnancy alone had signaled [defendant] that she engaged in premarital sex, and that the school does not otherwise inquire as to whether [any other] teachers engage in premarital sex . . . . These admissions raise an issue of material fact as to whether [defendant] enforces its policy solely by observing the pregnancy of its female teachers, which would constitute a form of pregnancy discrimination.
>
> [Ibid.]

Also, here, although plaintiff acknowledged that premarital sex was contrary to the tenets of the Church, it was undisputed on summary judgment neither the defendant's code of ethics nor its handbook contained any express prohibition against premarital sex despite prohibiting numerous other behaviors

_____

[8] We reject defendant's reliance on McKenna's certification as irrelevant. McKenna had nothing to do with plaintiff or Lee's termination of plaintiff's employment.

and conduct. Moreover, nothing stated that having premarital sex would result in automatic termination. Under the totality of these circumstances, we are constrained to again vacate the award of summary judgment to defendant.

Reversed and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION